AF Approval ⟨signature⟩                                    Chief Approval ⟨signature⟩

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 6:23-cr-3-RBD-DCI

MOAD MOHAMED BENKABBOU

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, and the defendant, MOAD MOHAMED BENKABBOU, and the attorney for the defendant, Corey I. Cohen, mutually agree as follows:

### A.    Particularized Terms

1.    Counts Pleading To

The defendant shall enter a plea of guilty to Counts One and Two of the Indictment.  Counts One and Two charge the defendant with False Statement to a Federal Agency, in violation of 18 U.S.C. § 1001.

2.    Maximum Penalties

Counts One and Two each carry a maximum sentence of 8 years' imprisonment, a fine of $250,000, a term of supervised release of not more than 3 years, and a special assessment of $100 per felony count.  With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to

Defendant's Initials  M B

make restitution to any victim of the offenses, or to the community, as set forth below.

     3.    *Apprendi v. New Jersey*

Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the defendant is subject to a maximum sentence of 8 years' imprisonment as to Counts One and Two because the following facts have been admitted by the defendant and are established by this plea of guilty:  the statements made involved international terrorism.

     4.    Elements of the Offenses

     The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.  The elements of Count One and Two are:

| | |
|---|---|
| First: | The Defendant made the statement, as charged; |
| Second: | The statement was false; |
| Third: | The falsity concerned a material matter; |
| Fourth: | The Defendant acted willfully, knowing that the statement was false; |
| Fifth: | The false statement was made or used for a matter within the jurisdiction of a department or agency of the United States; and |
| Sixth: | The statement was made in an investigation involving international terrorism. |

     5.    Counts Dismissed

     At the time of sentencing, the remaining count against the defendant, Count Three, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

Defendant's Initials   M B          2

6.      No Further Charges

If the Court accepts this plea agreement, the United States Attorney's
Office for the Middle District of Florida agrees not to charge defendant with
committing any other federal criminal offenses known to the United States
Attorney's Office at the time of the execution of this agreement, related to the
conduct giving rise to this plea agreement.

7.      Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information
is received suggesting such a recommendation to be unwarranted, the United States
will not oppose the defendant's request to the Court that the defendant receive a two-
level downward adjustment for acceptance of responsibility, pursuant to USSG
§ 3E1.1(a). The defendant understands that this recommendation or request is not
binding on the Court, and if not accepted by the Court, the defendant will not be
allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior
to operation of subsection (a) is level 16 or greater, and if the defendant complies
with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement,
including but not limited to, the timely submission of the financial affidavit
referenced in Paragraph B.5., the United States agrees to file a motion pursuant to
USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant
understands that the determination as to whether the defendant has qualified for a
downward adjustment of a third level for acceptance of responsibility rests solely

Defendant's Initials  M B                    3

with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

      8.    Cooperation - Substantial Assistance to be Considered

      Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the

Defendant's Initials  M B         4

imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

10.    Cooperation - Responsibilities of Parties

a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this

Defendant's Initials  M B        5

agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)     The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)     The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case,

Defendant's Initials  MB          6

pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

**B.     Standard Terms and Conditions**

1.     Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution

Defendant's Initials ___M B___                      7

to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $200, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2. Supervised Release

The defendant understands that the offenses to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

Defendant's Initials ___M B___          8

3.   Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.   Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.   Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party.

Defendant's Initials _MB_          9

The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.   Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or

Defendant's Initials __MB__             10

defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7. Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

Defendant's Initials  M B         11

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.   Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that

Defendant's Initials  M B          12

defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.  <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials __MB__          13

12. <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13. <u>Certification</u>

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 2nd day of ~~April~~ May, 2023.

ROGER B. HANDBERG
United States Attorney

MOAD MOHAMED BENKABBOU
Defendant

Shawn P. Napier
Assistant United States Attorney

Corey I. Cohen
Attorney for Defendant

Cherie Krigsman for
Assistant United States Attorney
Chief, National Security Section

Defendant's Initials  MB                14

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                         CASE NO. 6:23-cr-3-RBD-DCI

MOAD MOHAMED BENKABBOU

### PERSONALIZATION OF ELEMENTS

1.  Did you make the statements charged, i.e., did you answer "No, I didn't" when questioned by the Federal Bureau of Investigation regarding the questions posed in Counts One and Two?

2.  Were the statements you made false?

3.  Did the false statements concern a material matter?

4.  Did you act willfully, knowing that the statements were false?

5.  Were the false statements made within an investigation by the Federal Bureau of Investigation, which was a matter within the jurisdiction of a department or agency of the United States?

6.  Were the false statements made in an investigation involving international terrorism?

Defendant's Initials ___MB___            15

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                           CASE NO. 6:23-cr-3-RBD-DCI

MOAD MOHAMED BENKABBOU

FACTUAL BASIS

On or about August 9, 2022, in the Middle District of Florida, the defendant, Moad Mohamed Benkabbou, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, and involving international terrorism; that is during an international terrorism investigation conducted by the Federal Bureau of Investigation, the defendant was interviewed by federal law enforcement officers, was asked "Did you ever talk to Ahmed about ISIS or a terrorist organization?" and was asked whether he ever talked to Ahmed, or anyone else, about "travel[ling] overseas to join ISIS?" The defendant answered "No, I didn't" to both questions. Both of these statements were false, as the defendant knew, because he had talked to Ahmed on multiple occasions from January to August 2020 about ISIS and had made plans to travel overseas to join ISIS by booking an airplane ticket in August 2020.

At all times relevant to Counts One and Two, the Islamic State of Iraq and al-Sham, a/k/a, ISIS, ISIL, the Islamic State, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and the Al-

Defendant's Initials __MB__                16

Furqan Establishment for Media Production, was designated by the United States as a Foreign Terrorist Organization (FTO). In addition, at all times relevant to Counts One and Two, al-Qa'ida in the Arabian Peninsula (AQAP), a/k/a, Ansar al-Shari'a (AAS) was designated as FTOs.

In the summer of 2019, the FBI began investigating the defendant for possible involvement in international terrorism. In November 2019, the FBI learned that an undercover officer in another state (UC) had been communicating in an online social media group with the defendant. An initial investigation revealed that the defendant had been engaged in multiple online groups/forums on multiple social media platforms since the summer of 2019. The summary below captures communications across multiple social media platforms utilized by the defendant.

During many of these communications the defendant used some Arabic terms or abbreviations for Arabic terms. For example, the defendant routinely mentioned traveling for "hijrah", making "jihad, jhd, or J", supporting "dawlah, dawla, or D", and "khilafah." The defendant explained to individuals with whom he communicated that they should be careful about actually spelling out or saying "jihad" or "dawlah" because the government monitored their communications. "Hijrah" in the context of violent Islamic extremism is a term used to express an individual's journey from his country of origin to join and fight on behalf of a terrorist organization in a terrorist-held territory abroad. "Jihad" in the context of violent Islamic extremism is a term used to mean fighting. "Dawlah" is a term used by radical Islamic extremist groups to refer to the Islamic State that ISIS wants to establish. "Khilafah" refers to leadership

Defendant's Initials __M ß__          17

of an Islamic state under an Islamic steward with the title of a caliph or caliphate. In addition, the defendant spoke about the importance of a "bay'ah" or "bayat" on multiple occasions. A "bay'ah" is an oath or allegiance to an emir. In reference to Islamic extremists it is an oath or allegiance to support ISIS leadership.

For example, on November 9, 2019, the UC asked the defendant if he wanted to make hijrah. The defendant responded, "Yea to Libya or Iraq." The UC told the defendant that it would be difficult to travel to those countries and the defendant replied, "Yeah ik [I know] just go to neighboring countries." When the UC suggested Yemen, the defendant responded "Bro people are starving. 25 million people in Yemen need assistance to survive."

Then the defendant responded, "That's Syria the complicated one. To get to Iraq by Syria. Libya still sounds good, stable economy and dawla is there. Whoever controls the resources there and establish sharia there, will win the hearts of Muslims and therefore he can expand the khilafah, like Syrian resources." The UC told the defendant that getting to those areas is difficult because the areas are controlled. The defendant responded, "Ohh then nvm [nevermind]. Lebanon or Jordan. Yes, but we won't stay there. Just pass through. I would wait for a new khilafah. Idk but ik it's the only other country u can use to get to Iraq. Libya still good to me. Libya or Algeria."

On November 30, 2019, the defendant wrote to the UC, "Inshallah [God-willing] akhi [brother]…You can delete the message. I'm planning too, al q and HTS [al q refers to Al-Qaeda and HTS refers to a Syrian based FTO, Hayat Tahrir al Sham]

Defendant's Initials ___M B___          18

sounds good to me.  Nah bro I'm on my own.  There's a guy in the emirates who can hold me for a few days but that wouldn't help in as sham [historical reference to Greater Syria] or Maghreb."  The defendant then sent a map to the UC of a possible trip route.   The defendant continued writing, "I wasn't into the concept of jihad until recently akhi.  I was brainwashed into thinking the west is doing the justice by fighting the killers of Muslims… It's the complete opposite."  The defendant then commented on the state of Arab and Muslim majority countries writing, "Ikr [I know right] akhi, we must liberate the entire Muslim world. They're all corrupt, or the majority, and remove the borders."

On December 19, 2019, the defendant changed one of his social media account photos to the picture below, with the caption in Arabic that, translated into English, read: "Hey Crusaders hey Jews die with/in your rage."



On the same date, the defendant sent the UC an ISIS propaganda video through a social media application.  The video was approximately 4 minutes long and featured

Defendant's Initials  M B                     19

French and English subtitles that focused on executions, beheadings, and bombings.

Later, the following exchange took place between the defendant and the UC.

DEFENDANT:     Did you make bay'ah.

UC:            In my heart yes and in mind.  Have you akhi.

DEFENDANT:     Yeah from the moment they announced it. It's mandatory.
               I did in my heart and mind, I don't know what to say to
               make bay'ah tho.

The UC then shared a bay'ah template that read:

I pledge allegiance to the Commander of the Faithful Abi Bakr Al-
Baghdadi Al-Husseini Al-Qurashi on hearing and obedience in the
stimulant the compulsion, the hardship and the ease and the impact on
me and that I do not disagree with his family except that I see a disbelief
that I have in it from God, proof and God is what I say a martyr

Then the UC stated, "It needs to be corrected.  But will give u an idea.  I'll send

the original later inchaallah."

On December 29, 2019, during online communications with the UC, the

defendant sent the UC an audio recording from an ISIS spokesman, Abu Hamza Al

Qureshi, who told followers to pledge allegiance to Abu Ibrahim Al-Hashimi Al

Qureshi, the new leader of ISIS.  They discussed the areas where ISIS was active

including Idlib, Syria, and Africa, specifically, the Sinai in Egypt, and elsewhere

throughout the world.  In addition, the defendant expressed interest in assassinating a

high-ranking Florida government official for his pro-Israel political positions, stating,

"Akhi if I cannot make hijrah, the least I could do is to assassinate [a high-ranking

Florida government official].  He's a strong support [sic] of Israel and passed a law

ruining the business life of anyone who's against Israel."

Defendant's Initials ___MB___          20

On January 27, 2020, the defendant informed the UC that he needed to "clear" his cellular telephone because the United Kingdom (UK) was conducting raids. The defendant was worried the raids may implicate him because he had learned that two people in one of the social media groups he had joined had been arrested in the United Kingdom on terrorism-related charges.

On January 30, 2020, the defendant sent the UC a message indicating he wanted to learn how to do a proper bay'ah. The UC informed the defendant that he would research online how to pledge a legitimate bay'ah. The defendant told the UC that he would do the same. The defendant also stated that one of the Afghani girls that he knows had already made bay'ah.

On January 31, 2020, the defendant verbally pledged his bay'ah to ISIS. Specifically, the defendant messaged the bay'ah template that the UC had originally sent to the defendant. The bay'ah pledge then occurred via a social media application as outlined below:

| DEFENDANT: | We'll just do this. It's all we have Alhamdulilah  Skip the last two words 'proof and.' Let me know when ur starting. |
| UC: | Ok akhi do we say this in our heart or out loud. |
| DEFENDANT: | I think out loud. |
| UC: | Inshallah should we record and send each other or not necessary? |
| DEFENDANT: | Not necessary bro cuz I would like to remain anonymous. I don't trust [this social media platform] fully lol. |
| UC: | Excellent my brother.  Good so we should do this when you are ready. |

Defendant's Initials __MB__          21

DEFENDANT:      I'm ready now.  Akhi.

UC:                    Me too brother.  I am doing so now.

After a brief congratulatory exchange, the UC continued:

UC:                    I cannot begin to say how I am happy wa alahi [Oh God].

DEFENDANT:      Same bro I feel part of dawlah.  All there is left is hijrah.

UC:                    We are mentally there allahu Akbar [God is most great].

DEFENDANT:      I might try to finish college early and get a certificate instead
                       for the sake of hijrah.

On or about February 6, 2020, the UC asked the defendant whether another participant in the group "wants IS like us?"  The defendant stated: "he said any that fights for haqq. [term meaning truth].  He chose Yemen.  He is still young so I won't take him seriously unless he insists on jhd."  Later in conversation, the UC asked the defendant, "From your opinion which brothers or sisters there upon haqq and want dawlah?"  The defendant replied, "Very few akhi.  Based_islam [sic] wants ansar sharia in Yemen but the possibility for the state is always open to him.  A sister form [sic] the UK and one from USA wants a state."

Over approximately eight months in 2020, the defendant had extensive conversations with an individual he knew as "Ahmed" about ISIS, including joining ISIS, the specifics of the ISIS leadership, ISIS base of operations, ISIS training grounds, ISIS supporters, and ISIS ideology.  "Ahmed" was a confidential source for the FBI who recorded his interactions with the defendant.  The defendant sent "Ahmed" beheading videos and other ISIS propaganda material, via text.  In addition,

Defendant's Initials  MB                22

on multiple occasions the defendant would show videos to "Ahmed" in person on his own cell phone.

The defendant and "Ahmed" engaged in multiple discussions about how best to travel overseas to join ISIS fighters. The defendant and "Ahmed" discussed traveling to Jordan and Turkey in order to get into Syria and Iraq. The defendant also provided "Ahmed" with the name and contact information for an "ISIS facilitator" who would assist them in traveling to support ISIS and join the fight in Syria and Iraq.

For example, on March 24, 2020, the defendant told "Ahmed" that it was difficult to travel "then" but that one could fly from Miami to Morocco for $700. Throughout the day the defendant continued to tell "Ahmed" about Middle East politics and share ISIS propaganda videos with him.

Further, on June 12, 2020, the defendant told Ahmed that in "America" they could not "do much" because you could only kill a few people, but that Jordan was different and that you could kill 20-30 people and move on. Later on that day the defendant also talked about sending money to Syria and specifically mentioned sending money to a woman imprisoned in a camp in Syria. Finally, the defendant explained to "Ahmed" that he needed to be careful on social media and told him not to say that he is an American or to use his name. In addition, the defendant told "Ahmed" to type only "J", "D", and "H", instead of jihad, dawlah, or hijrah. The defendant explained that this was necessary to avoid detection from the authorities.

During this time period, the defendant sent money via Paypal to a woman imprisoned in a camp in Syria. The defendant sent money via Paypal to this woman

Defendant's Initials __M B__          23

on several occasions.  In exchange, the woman provided the defendant with the name of an individual to help facilitate travel to Syria or Iraq for hijrah.  The defendant provided "Ahmed's" social media information to the facilitator.

On July 25, 2020, the defendant and "Ahmed" had a long discussion regarding traveling to support ISIS.  Specifically, the defendant told "Ahmed" that they should travel through Turkey and if they were ever questioned or asked about traveling to Turkey, they could just claim that they were traveling as tourists to see the Hagia Sophia mosque. In the same conversation, "Ahmed" told the defendant that he had received a message from someone offering to help arrange travel for hijrah.  The defendant told "Ahmed" that the facilitator was legitimate and that he had given the facilitator "Ahmed's" contact information so that they could exchange information about traveling for hijrah.  The defendant explained that he was introduced to the facilitator by the woman they sent money to in Syria.  The defendant explained that he had been talking to the woman for "months" and asking for information about traveling to Syria. Finally, the defendant told "Ahmed" that he had written a letter to his parents and that he planned to call his parents after he left to tell them where the letter was.  The defendant explained that he wrote in the letter that he was traveling to commit jihad and that his parents should not tell the authorities about his plans.

On August 6, 2020, the defendant and "Ahmed" booked airplane tickets in order to travel to fight with ISIS.  The defendant and "Ahmed" discussed the purchasing of the tickets for over three hours and discussed the pros and cons of booking tickets, dates, prices, and various locations.  Finally, the defendant told

Defendant's Initials ___MB___                    24

"Ahmed" that it was time to do it.  "Ahmed" booked his airline ticket first, and then the defendant did but only after having some technical difficulties.

Almost immediately, the defendant claimed to "Ahmed" that he had forced him to buy the airplane tickets, and he cancelled his reservation.  The defendant claimed that the technical difficulties that he faced in purchasing the ticket were a sign that he should not actually travel for hijrah right now.

On August 12, 2020, the defendant and "Ahmed" met again.  The defendant again started talking about traveling to Turkey or Greece as an entrance point to get to Iraq or Syria, and they discussed the pros and cons of traveling to each destination. The defendant stressed to "Ahmed" the importance of buying a new phone and not just "wiping" the phone because the government was still able to find information on the phone if it was only "wiped."  The defendant then asked "Ahmed" if he thought you would be able to have a copy of the Quran in prison. The defendant then showed "Ahmed" ISIS propaganda videos and explained that one of the videos showed someone making a bomb.  Another video showed ISIS fighters executing others. Then, the defendant reiterated that they should look at traveling to Turkey before school started on August 25th.

Finally, the defendant told "Ahmed" that "Dawlah" sent a video out a few weeks ago encouraging people to start fires if they could not travel and make hijrah. According to the defendant, 20,000 to 30,000 fires had been started in California since the video came out.  The defendant explained that starting fires causes the "kufar" ["kufar" refers to someone who does not agree with the teachings of Allah] to spend

Defendant's Initials __MB__               25

money on the fires and distracts the "kufar" from "finding the Muslims." The defendant stated that if you cannot make hijrah and cannot buy a gun then you should start a fire with a match.

On August 26, 2020, "Ahmed" met with the defendant and told him that he was meeting with him to say goodbye. "Ahmed" explained that he had decided to travel to support ISIS but that he was not giving the defendant the specifics of his travel plans. The defendant again warned "Ahmed" to get a new phone because he had read a news story about someone that was captured, and they had looked through his phone and arrested someone that he had talked to before he traveled. The defendant explained that the person got five years in prison just for talking to someone who had traveled to support ISIS. The defendant told "Ahmed" that he would think about going with him. "Ahmed" responded that he had waited until August 25th to see if the defendant was going to go, and that he clearly was not ready. Nevertheless, the defendant continued to ask "Ahmed" whether he could go and stated at one point that he would see "Ahmed" "there."

In January 2021, the FBI learned that the defendant had booked another airline ticket, for travel on January 3, 2021, from Orlando to Instanbul, Turkey (via New York and Amsterdam), with a return flight on January 12, 2021, from Istanbul, Turkey (via Paris and Atlanta). The defendant also cancelled this ticket shortly after booking it.

In early July 2021, the FBI learned that the defendant and the defendant's family had booked travel to Morocco and planned to leave from the Miami

Defendant's Initials ___MB___          26

International Airport on July 8, 2021.   FBI agents interviewed the defendant at the airport when the airline denied him a boarding pass.

During the ensuing interview, the defendant was asked several times if he supported any terrorist organizations. The defendant responded "no" each time. The agents also asked the defendant if he had previously attempted to join a terrorist organization or had attempted to travel to join one. The defendant said "no." The agents asked if he had ever pledged to join a terrorist organization. Again, the defendant said "no."

In addition, the FBI agents asked the defendant if he knew anyone who was a terrorist or who supported a terrorist organization. The defendant said "no." Agents asked if he knew anyone who had travelled to join a terrorist organization, or who had claimed to be traveling to join a terrorist organization, even if he did not believe them. Again, the defendant said "no."

The agents then asked the defendant if he previously had sent any money overseas. The defendant informed the agents that he had sent money "to charity" through an individual in the United Kingdom, to help feed the poor in Yemen and Myanmar, He further stated that he had sent money to family members in Morocco through his father.  However, the defendant said that he did not send money to anyone else overseas.

Specifically, the defendant was asked if he had used PayPal to send money overseas.  The defendant insisted that, although he had a PayPal account, he never

Defendant's Initials  MB          27

had used it. In fact, the defendant sent money via PayPal on multiple occasions to women held in camps in Syria.

The FBI agents also asked the defendant if he had ever previously purchased a ticket to travel overseas that he booked himself, as opposed to one booked by his parents. The defendant answered "no." They also asked him if he had ever purchased a ticket to travel overseas, even if he later cancelled it. This time the defendant stated that he had booked one ticket to Turkey the previous summer, but that he had ended up cancelling it. He claimed that he had purchased the ticket at the recommendation of his mother, to travel to Turkey to visit the Hagia Sophia mosque, but that he had cancelled the flight due to school-related financial hardships.  The defendant also claimed that he had not booked any other travel at all.

On August 9, 2022, FBI again interviewed the defendant when they learned that he was employed at a rental car agency near the Orlando International Airport. At the beginning of the interview the agents confirmed that the defendant remembered them and asked if he understood that it was a crime to lie to the FBI. The defendant responded "Yea."

The agents then explained, "we got some phone records and there's an individual that we have reason to believe may have traveled for the wrong reasons." They then showed the defendant a photo of "Ahmed" and the defendant said, "Yea I know him." The defendant explained that he knew "Ahmed," and had met him at a local university.

Defendant's Initials _M B_                          28

The defendant then claimed that "Ahmed" had invited him to travel with him. Specifically, the defendant stated: "[I]n August of last year, [Ahmed] told me that he would fly to Turkey and he wants me to um [UI] Turkey with him because uh tickets were cheap and all of that stuff. . .. Yea, he wanted me to go with him to-to tour. Uh I buy the ticket and then I declined it…I buy the ticket and then I canceled the flight." The defendant stated that "Ahmed" claimed to be going to Turkey "for tourism." After the agents reminded the defendant that during the July 2021 interview, he told them that his mom, and not "Ahmed," had told him to travel to go see a mosque, the defendant responded, "Yea, my mom told me to go see a mosque and then when he told me he told that we can go to Turkey I thought it was a good time but then I had suspicions about this guy." The defendant claimed that he had canceled the ticket about one week later, and that "when I canceled, he kept asking me are you sure, are you sure, are you sure…you don't wanna go with me?" The defendant further claimed later in the interview that "Ahmed" "tried to insist [that I travel with him] for me to buy the ticket again."

Later, the agents stated, "so obviously we assume he went to Syria to join ISIS…they were in power I think at that time" and asked the defendant, "did he ever talk to you about ISIS, did you ever talk to him about ISIS?" The defendant stated "No," and that he had just told "Ahmed" about "general belief" like "prayer and giving charity."

Then, the agents specifically asked, "Did you ever talk to "Ahmed" about ISIS or a terrorist organization?" The defendant answered, "No I didn't."

Defendant's Initials __M B__          29

Then, the following exchange took place:

FBI:            Ok, did he ask you to contact anybody for him? On behalf of him?

Defendant:      No?

FBI:            Um did you give him anyone to talk to over there... you said you're from Morocco, do you know anybody in that area? In Syria or Turkey?

Defendant:      No

FBI:            So you never had him contact anybody?

Defendant:      I cut off contact with anybody that's not from the United States.

FBI:            Ok

Defendant:      Yea, the only the only person I talk to...in in Britain U.K.

FBI:            Mhm

Defendant:      I give charity...to that person

FBI:            Yea

Defendant:      And I talk to my family in Morocco.

FBI:            Gotcha, so I mean but, he never asked you to contact anybody?

Defendant:      No

Later in the interview, the agents asked the defendant whether he had given

"Ahmed" anyone's information so that person could help "Ahmed" get from Turkey

to Syria.  The defendant stated, "No. No, I did not."

Defendant's Initials ___MB___                30

As the interview was concluding the agents asked again "let me, let me, ask again...Did you, so, do you, did you, support any terrorist organization?" The defendant responded, "No."

The defendant then went on to claim that he had never made plans to travel overseas with "Ahmed" or anyone else to join ISIS:

| | |
|---|---|
| FBI: | Did you ever make plans with this individual [pointing at a photo of "Ahmed"] or any other individual to travel overseas to join ISIS? |
| Defendant: | No I didn't. |
| FBI: | Ok, Did this individual [pointing at a photo of "Ahmed"] try to convince you to travel to Turkey for tourism? |
| Defendant: | Yes. |
| FBI: | Ok, did this individual [pointing at a photo of "Ahmed"] try to convince you to travel to Turkey join ISIS? |
| Defendant: | No. |
| FBI: | Ok, was there any discussion at any time with this individual [pointing at a photo of "Ahmed"] about traveling overseas to join ISIS? |
| Defendant: | No |
| | … |
| FBI: | Thanks for talking to us. Um, again just we have to end it this way so you, your, your, understanding. Everything you told us today was the truth correct? |
| Defendant: | Yes. Yes. |
| FBI: | And you do understand that lying to federal agents is a crime? |

Defendant's Initials __MB__          31

Defendant:     Yeah

FBI:           Ok.

Defendant:     Five years

FBI:           Five years, yea and depending on, um, anything else?
               Yeah, no if you remember anything at all, anything at all
               even if you don't think it's a big deal.

Defendant:     Yeah.

FBI:           Let us know.

Defendant:     I will.

Defendant's Initials  M B          32