UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                          CASE NO. 6:23-cr-3-RBD-DCI

MOAD MOHAMED BENKABBOU

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, files its Sentencing Memorandum, and states:

## INTRODUCTION

On January 31, 2020, the Defendant swore the *bay'ah*,[1] pledging his allegiance and obedience to ISIS and, therefore, obligating himself to carry out its violent purposes no matter the cost.  In fact, immediately after swearing the pledge, the Defendant proclaimed himself a member of ISIS (*dawlah*)[2] and declared his intent to travel overseas to fight for ISIS (*hijrah*),[3] stating: "I feel part of dawlah. All there is left is hijrah."

---

[1] "Bay'ah" is an Arabic term meaning an oath of allegiance to an emir.  In reference to Islamic extremists, it is an oath of allegiance to support ISIS leadership.  PSR, Doc. 65, ¶ 11.

[2] "Dawlah" is a term used by radical Islamic extremist groups to refer to the Islamic State that ISIS wants to establish.  PSR, Doc. 65, ¶ 11.

[3] "Hijrah" in the context of violent Islamic extremism is a term use to express an individual's journey from his country of origin to join and fight on behalf of a terrorist organization in a terrorist held territory abroad.  PSR, Doc. 65, ¶ 11.

From that moment forward, the Defendant, who had spent the previous several months communicating with ISIS supporters, educating himself on the radical jihadi principles of ISIS, and espousing ISIS propaganda online, embarked on a relentless pursuit to live out his *bay'ah* oath. Between 2019 and 2021, the Defendant sent money overseas to support ISIS, communicated with an ISIS facilitator, meticulously crafted a plan to travel to Iraq and/or Syria to fight for ISIS, deliberately engaged in and promoted evasive tactics to avoid detection by law enforcement, attempted to recruit and radicalize another individual whom the Defendant encouraged to travel overseas to fight for ISIS, and took significant steps, including buying an airline ticket, to actually make *hijrah*.

The Defendant's escalating conduct directly reflected his intensifying radical beliefs, which grew from an interest in ISIS to an all-consuming obsession.  The Defendant watched and shared violent ISIS propaganda videos, depicting executions, beheadings, bombings, and rape.  The Defendant agonized over the best route to join ISIS fighters in Iraq or Syria.  The Defendant painstakingly planned how he would mislead his family and others into believing he was traveling overseas for humanitarian purposes.  Virtually every aspect of the Defendant's life was aimed at fighting for ISIS and evading detection so that he could fight for ISIS.

During this time, as the testimony at sentencing is anticipated to show, the Defendant was honest about his intentions, stating in December 2019 to an online undercover officer that "[t]he biggest problems are those killing Muslims.  France, USA, and Uk need to be brought to justice.  Someone needs to be brave enough to

face these crusaders."  In June 2020, the Defendant's rhetoric continued to escalate when he stated that he could not do much in America because he could only kill a few people, but that Jordan was different because he could kill 20-30 people and then move on.  As the testimony at sentencing is expected to establish, by August 2020, the Defendant was explaining to the person known to him as "Ahmed" (who was actually an FBI source) that if you cannot make *hijrah*, then you get a gun and do *jihad*[4] on your land.  The Defendant stated that his preference, though, was *hijrah*, as it allows you to have a life; you go and fight and then come home to your women and children.

Finally, in 2021 and 2022, when confronted by FBI agents in relation to his support for ISIS, the Defendant acted exactly how he had planned: he lied and attempted to deceive the FBI.  The Defendant lied to avoid detection, because, as he had explained to Ahmed and as the testimony at sentencing is anticipated to show, the very worst outcome for him (worse than fighting and surviving and worse even than dying an ISIS "martyr") would be to get caught by law enforcement before he could make *hijrah* and fulfill his obligation to kill for ISIS.

As explained below, because the Defendant's offense, lying to FBI agents during the course of an international terrorism investigation, involved or was intended to promote, a federal crime of terrorism that was calculated to influence or affect the conduct of government by intimidation or coercion, the Court should apply the

---

[4] "Jihad" in the context of violent Islamic extremism is a term used to mean fighting.  PSR, Doc. 65, ¶ 11.

terrorism enhancement under USSG § 3A1.4.  Moreover, based on a consideration of all the sentencing factors, including the Defendant's unwavering devotion to radical jihadi extremism and his admitted desire and willingness to kill for ISIS, a significant sentence of imprisonment is warranted.  The United States, therefore, recommends a sentence of 96 months' imprisonment on each of Counts One and Two, to run concurrently, followed by three years' supervised release.

## PROCEDURAL BACKGROUND

On January 11, 2023, a federal grand jury indicted the defendant, Moad Mohamed Benkabbou, on three counts of false statements to a federal agency related to a terrorism investigation.  Doc. 1.  On May 5, 2023, the defendant pled guilty, pursuant to a Plea Agreement, to two of the three counts of the indictment.  Docs. 41, 43.  At sentencing, the United States will ask this Court to dismiss Count Three of the indictment.  The defendant faces a statutory maximum sentence of eight years' imprisonment for each count.  Doc. 41.

The Probation Officer prepared a presentence investigation report (PSR) and determined that, based on a total offense level of 29 (which includes an 18-level increase for application of the terrorism enhancement under USSG § 3A1.4) and a criminal history category of VI (resulting from application of the terrorism enhancement under USSG § 3A1.4), the Defendant's advisory guideline imprisonment range is 151 to 188 months. PSR, Doc. 65, ¶¶ 57-66, 70. The Defendant has objected to application of the terrorism enhancement.

## FACTS

The plea agreement sets out a detailed recitation of the facts in this case, as does the PSR, which the United States hereby incorporates. Doc. 42; PSR Doc. 65, ¶¶ 9-51. In addition to the facts in the Plea Agreement and PSR, witness testimony will also be offered at sentencing in relation to the terrorism enhancement and the 18 U.S.C. § 3553 factors. The United States plans to offer the following documents, copies of which have been submitted to the Court, as sentencing exhibits: **Attachment 1** (NY reporting and corresponding online communications between Defendant and UC); **Attachments 2, 3, and 4** (FBI source reporting relating to the Defendant's communications with "Ahmed"); **Composite Attachment 5** (PayPal records showing money sent by Defendant); **Composite Attachment 6** (IP records supporting that the Defendant sent money overseas); **Attachment 7** (audio recordings of the Defendant speaking with FBI source "Ahmed" and corresponding transcript).[5]

### A. In 2019, the Defendant Promoted Radical Islamic Ideology Online, and Communicated with an Undercover Officer about *Hijrah*.

In the summer of 2019, FBI began investigating the Defendant for his possible involvement in international terrorism. PSR, ¶ 10. The Defendant was prolific on online social media groups espousing radical Islamic jihadi views. *Id.*

---

[5] The document portion of Attachment 7 is attached hereto, and a copy of the corresponding audio recording is being separately submitted to the Court. A copy of the remaining Attachments, which the United States expects to offer into evidence, under seal, at the time of sentencing, are also being separately submitted to the Court.

By November 2019, the Defendant started discussing making *hijrah* with an FBI undercover officer (the "UC").  *Id.* 10-12.  The Defendant talked about going to Iraq or Syria and sent the UC a map of a possible trip route. *Id.* at 14. Around that time, the Defendant stated to the UC, "I was brainwashed into thinking the west is doing the justice by fighting the killers of Muslims…It's the complete opposite."  *Id.* He continued, "[W]e must liberate the entire Muslim world.  They're all corrupt, or the majority, and remove the borders." *Id.*

In December 2019, the Defendant sent the UC an ISIS propaganda video focusing on executions, beheadings, and bombings.  *Id.* at 16. Around the same time the Defendant began discussing swearing the *bay'ah* with the UC. *Id.* at 17. The Defendant explained that "from the moment [ISIS] announced it," he had made the pledge in his "heart and mind."  *Id.* Later in December 2019, the Defendant sent an audio recording to the UC of an ISIS spokesman telling followers to pledge their allegiance to the new ISIS leader (Abu Ibrahim Al-Hashimi Al Qureshi). *Id.* at 20. On the same day, the Defendant stated to the UC that, if he could not make *hijrah*, "the least I could do is assassinate [a high-ranking Florida government official]. He's a strong supporter of Israel and passed a law ruining the business life of anyone who's against Israel." *Id.*

**B. In Early 2020, the Defendant Swore the *Bay'ah*, Began Interacting with "Ahmed" and Started to Plan for *Hijrah*.**

By January 2020, the Defendant was advising the UC to clear his cell phone to avoid detection by law enforcement.  *Id.* at 21.  On January 31, 2020, the Defendant

swore the *bay'ah* during a conversation with the UC.  *Id.* at 23. The Defendant

explained immediately after the pledge that he felt part of dawlah and "[a]ll that is

left is hijrah." *Id.*  The Defendant also explained that he "might try to finish college

early and get a certificate instead for the sake of hijrah." *Id.*

Concerned with the fact that the Defendant had sworn his allegiance to ISIS,

and in light of the Defendant's escalating extremist views, the FBI used a

confidential source known to the Defendant as "Ahmed" to communicate with the

Defendant in 2020.  *Id.* at 25. The source recorded his interactions with the

Defendant.  *Id.*  During the eight months when the Defendant interacted with

Ahmed, the Defendant educated Ahmed on Middle East politics, shared ISIS

propaganda videos with Ahmed, and made plans with Ahmed to travel overseas to

fight for ISIS. *Id.* at 25-27. Effectively, over the course of their relationship, the

Defendant attempted to recruit Ahmed to ISIS.

**C. By the Summer of 2020, the Defendant was Teaching Ahmed How to Avoid Detection; Sending Money Overseas to Support ISIS; and Connecting with an ISIS facilitator for purposes of *Hijrah*.**

By the Summer of 2020, the Defendant was focused almost exclusively on

making plans for *hijrah* to fight for ISIS and avoiding detection by law enforcement.

On June 12, 2020, the Defendant told Ahmed that in America they could not "do

much" because they could only kill a few people, but in Jordan it was different, and

they could kill 20 to 30 people and move on.  *Id.* at 28. On the same date, the

Defendant discussed sending money to a woman imprisoned in a camp in Syria. *Id.* at

28.  The Defendant also instructed Ahmed that he needed to be careful on social media; that he should not say he is an American or use his name; and that he should type only "J," "D," and "H" for *jihad*, *dawlah*, and *hijrah*, respectively.  *Id*. The Defendant explained that this was necessary to avoid detection by authorities.  *Id*.

Around the same time in June 2020, the Defendant, on several occasions, actually did send money via PayPal to a woman imprisoned in a camp in Syria.  *Id*. at 29.  In exchange, the woman provided the Defendant with the name of an individual to help facilitate travel to Syria or Iraq for *hijrah*.  *Id*. The Defendant also provided Ahmed's social media information to the facilitator.  *Id*.

In July 2020, the Defendant spoke extensively to Ahmed about traveling to support ISIS and the best route to take to meet up with ISIS fighters.  *Id*. at 30-33. The Defendant told Ahmed they should travel through Turkey and if they were ever questioned about it, they could just claim they were traveling as tourists to see the Hagia Sophia mosque. *Id*. at 30.  The Defendant also told Ahmed that he had received a message from an ISIS facilitator who offered to help arrange travel for *hijrah*.  *Id*. The Defendant explained that he had given the facilitator Ahmed's contact information so they could exchange information about traveling for *hijrah*.  *Id*. According to the Defendant, he was introduced to the ISIS facilitator by the woman they sent money to in Syria.  *Id*.  The Defendant also explained to Ahmed that he had written a letter to his parents, telling them he was traveling to commit jihad and not to tell the authorities.  *Id*.

D. **In August 2020, the Defendant and Ahmed Finalized Their Travel Plans and Booked Plane Tickets to Turkey.**

On August 6, 2020, the Defendant and Ahmed, after several hours of discussing the pros and cons of booking tickets, dates, prices, and locations, bought airline tickets to travel to fight with ISIS. *Id*. at 31. Almost immediately, the Defendant claimed that Ahmed had forced him to buy the tickets, and, with Ahmed's encouragement (as the testimony at sentencing is anticipated to show), the Defendant cancelled the reservation. *Id*. at 32.

On August 12, 2020, the Defendant started talking with Ahmed about traveling to Turkey or Greece as an entrance point to get to Iraq or Syria, and other travel logistics. *Id*. at 33. The Defendant stressed to Ahmed the importance of buying a new phone and not just wiping the phone, because the government was still able to find information on the phone if it was only wiped. *Id*. The Defendant also asked Ahmed if he thought one would be able to have a copy of the Quran in prison. *Id*. The Defendant then showed Ahmed ISIS propaganda videos showing bomb making and executions. *Id*. On the same date, the Defendant stated that if you cannot make *hijrah* and cannot buy a gun then you should start a fire with a match (after explaining that "*Dawlah*" sent a video out recently encouraging people to start fires if they could not travel and make *hijrah* because the fires cause the *kufar*[6] to spend money and distracts the *kufar* from finding the Muslims). *Id*. at 34.

---

[6] "Kufar" refers to someone who does not agree with the teachings of Allah.

On August 26, 2020, Ahmed met with the Defendant to say goodbye. *Id.* at 35. Ahmed told the Defendant that he was traveling to support ISIS but was not giving the Defendant the specifics of his travel plans. *Id.* Despite Ahmed stating that the Defendant was clearly not ready to travel, the Defendant continued to ask Ahmed if he could go and stated that he would see Ahmed there. *Id.* The Defendant had no further contact with Ahmed after September 2020.

### E. **In or around January 2021, the Defendant Booked Another Flight to Turkey.**

In January 2021, the FBI learned that the Defendant had booked another plane ticket for travel on January 3, 2021 from Orlando to Turkey, with a return flight about 10 days later. *Id.* at 36. The Defendant cancelled this flight shortly after booking. *Id.*

### F. **On July 8, 2021, the Defendant was Initially Interviewed by FBI at the Airport and Lied about his Support of ISIS.**

Roughly seven months later, in July 2021, the FBI learned that the Defendant and his family had booked travel to Morocco and planned to leave from Miami on July 8, 2021. *Id.* at 35. FBI interviewed the Defendant at the airport when the airline denied him a boarding pass. *Id.* At this interview, the Defendant denied, among other things, supporting any terrorist organization; denied ever pledging to join a terrorist organization; denied knowing anyone who had travelled or had claimed to be traveling to join a terrorist organization; denied sending money overseas except to feed the poor in Yemen and Myanmar and to help family in Morocco; denied ever using PayPal; and denied ever purchasing a ticket to travel overseas that he had booked himself. *Id.*

at 38-42. When asked if he had ever purchased a ticket to travel overseas even if he later cancelled it, the Defendant stated that he had booked one ticket to Turkey the previous summer, but that he had ended up cancelling it. *Id.* According to the Defendant, he had purchased that ticket at the recommendation of his mother, to travel to Turkey to visit the Hagia Sophia mosque, but had cancelled it because of school-related financial problems. *Id.*

### G. On August 9, 2022, the Defendant Lied to FBI Again, Denying that he had any Discussion with Ahmed about Traveling Overseas to Join ISIS.

On August 9, 2022, the FBI interviewed the Defendant a second time. *Id.* at 43. The Defendant admitted that he knew Ahmed when shown pictures of him, claiming that it was Ahmed who had invited him (the Defendant) to travel with him (Ahmed). *Id.* at 44-45. When asked whether Ahmed had ever talked to him about ISIS, or vice versa, the Defendant stated, "no" and claimed that he just told Ahmed his general beliefs like prayer and giving charity. *Id.* at 46. When asked by FBI if he had ever talked to Ahmed about ISIS or a terrorist organization, the Defendant stated, "No, I didn't." *Id.* at 47. When asked whether the Defendant had ever given Ahmed anyone's information so that person could help Ahmed get from Turkey to Syria, the Defendant stated, "No. No, I did not." *Id.* at 48. When asked if the Defendant had ever made plans with Ahmed to travel overseas to join ISIS, he responded, "No, I didn't." *Id.* at 50. The Defendant claimed that Ahmed had tried to convince him to travel to Turkey for tourism. *Id.* When asked if he had any discussion at any time with Ahmed about traveling overseas to join ISIS, the defendant stated, "No." *Id.*

**ARGUMENT**

**I.     The Terrorism Enhancement Should Apply**

The terrorism enhancement under USSG § 3A1.4 applies if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  Per Application Note 1 of that section, "federal crime of terrorism" has the meaning given in 18 U.S.C. § 2332b(g)(5).  In turn, Section 2332b(g)(5) provides that Federal crime of terrorism means an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of one of the enumerated offenses set forth in that section, which includes, section 2339B (relating to providing material support to terrorist organizations). Thus, USSG § 3A1.4 requires proof of the following two elements:

> (1) the defendant must have been convicted of an offense that involved or was intended to promote a federal crime of terrorism; and

> (2) the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

*See* 18 U.S.C. § 2332B(g)(5); *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001) (holding that district court must specify which of the terrorism offenses "the defendant intended to promote, satisfy the elements of § 2332b(g)(5)(A), and support its conclusions by a preponderance of the evidence standard…"); *United States v. Chandia*, 675 F.3d 329, 340 (4th Cir. 2012) ("Chandia III") (district court's finding that Chandia provided material support to LET leader to influence or affect

government conduct was adequate to support application of terrorism enhancement).

Here, as explained below, the terrorism enhancement should apply because the defendant's offense "involved, or was intended to promote" a federal crime of terrorism, that is, a violation of § 2339B (providing material support to a foreign terrorist organization), *and* that offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

A. *The Defendant's Offense "involved, or was intended to promote, a federal crime of terrorism."*

USSG Section 3A1.4 applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism" and the intent element is met. To meet the offense element, the defendant may have been convicted of one of the enumerated crimes listed in 18 U.S.C. § 2332b(g)(5)(B). Alternatively, he may receive the enhancement if his substantive offense or relevant conduct "involved, or was intended to promote" one of the enumerated crimes. *See, e.g.*, *United States v. Mandhai*, 375 F.3d 1243, 1247-48 (11th Cir. 2004) (applying enhancement to 18 U.S.C. § 844(n) conviction).  As the Eleventh Circuit explained in *Mandhai*, "[t]he enhancement is not limited, however, to offenses that are themselves federal crimes of terrorism. By including the "intended to promote" language, the drafters of the Guideline "unambiguously cast a broader net....The criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if "a goal or purpose [of the defendant's act] was to bring or help bring into being a crime listed in

18 U.S.C. 2332b(g)(5)(B)." *Id.*

In fact, many courts have concluded that the defendant need not be convicted of one of the enumerated federal crimes of terrorism for § 3A1.4 to apply. As the Sixth Circuit has explained:

> [T]he "intended to promote" language means something different from the word "involved." A defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism. On this reading, the offense of conviction itself need not be a "Federal crime of terrorism."

*Graham*, 275 F.3d at 516 ("[T]he defendant need not have been convicted of a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5) for the district court to find that he intended his substantive offense of conviction or his relevant conduct to promote such a terrorism crime."). *United States v. Stafford*, 782 F.3d 786, 792 (6th Cir. 2015) (applying enhancement to defendant charged with conspiracy to use a weapon of mass destruction and attempting to damage or destroy property used in interstate commerce where defendant's agenda was violent revolutionary escalation of the "Occupy Movement"); *United States v. Siddiqui*, 699 F.3d 690, 708–09 (2d Cir. 2012) (enhancement applied where defendant's offense—attacking American military personnel and FBI agents—was calculated to influence the government and retaliate against it, even if her intent was formed in a matter of seconds); *United States*

*v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011) (enhancement applied where ample evidence defendant sought to impose Sharia law in the Middle East and unseat the sitting governments there).

The Seventh Circuit has also affirmed application of the terrorism enhancement based on the defendant's purpose and intent to obstruct a terrorism investigation, even where the obstruction of justice offense was not a federal crime of terrorism and the defendant was acquitted of the terrorism charge. *United States v. Ashqar*, 582 F.3d 819, 826 (7th Cir. 2009). Likewise, the Second Circuit has found that "[t]he 'intended to promote' prong applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." *United States v. Awan*, 607 F.3d 306, 314 (2d Cir. 2010).

Importantly, Application Note 2 of Section 3A1.4 provides that "an offense that involved…obstructing an investigation of a federal crime of terrorism shall be considered to have involved, or to have been intended to promote, that federal crime terrorism." Also, "in determining whether the terrorism enhancement should apply for obstructing an investigation under Note 2, the enhancement is only appropriate for obstructing investigations into the specific offense of terrorism, and not general terrorism investigations or intelligence gathering." *United States v. Benkahla*, 501 F. Supp. 2d 748, 752 (E.D. Va. 2007); *see also United States v. Fidse*, 862 F.3d 516 (5th Cir. 2017).

i.    *Defendant's offense was intended to promote the provision of material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B*

Here, the Defendant's offense was intended to promote a violation of 18 U.S.C. § 2339B, which prohibits the knowing provision of "material support or resources" to a foreign terrorist organization or attempts or conspiracies to do so.[7] Section 2339B is an enumerated federal crime of terrorism under 18 U.S.C. § 2332b(g)(5). Under Sections 2339B(g)(4) and 2339A, the term "material support or resources" means –

> Any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, documentation or identification, communications, equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

> Section 2339B(h), relating to the provision of personnel, provides that –

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under the terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

---

[7] Section 2339B goes on to state that "[t]o violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization…that the organization has engaged or engages in terrorist activity…or that the organization has engaged or engages in terrorism."  18 U.S.C. § 2339B(a).

18 U.S.C. § 2339B(h).

Several courts have upheld convictions under § 2339 for provision of services and personnel to a foreign terrorist organization.  For example, in *United States v. Suarez*, 893 F.3d 1330, 1333 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 845 (2019), the defendant was convicted of violations of 18 U.S.C. §§ 2332a and 2339B after he plotted a bomb attack on a Florida beach in support of ISIS.  The FBI learned of the defendant's posting of ISIS propaganda and thereafter introduced a confidential source and an undercover agent to the defendant to disrupt the plot.  Challenging the sufficiency of the evidence on appeal, the defendant claimed that he did not provide material support or resources.  *Id*. at 1334.  The Eleventh Circuit disagreed, holding that the government had offered substantial evidence showing that Suarez knowingly provided material support to ISIS.  *Id*. at 1335.  The Eleventh Circuit noted the following:

> Through his Facebook account, Suarez posted ISIS propaganda, requested help in building bombs, attempted to recruit others to join him in attacks, and filmed a recruitment video to this end…He coordinated directly with individuals whom he believed to be members of ISIS in order to acquire a bomb.  He provided the money and materials for the bomb, and he accepted the bomb while reiterating his plan to detonate it on a crowded beach.  On this basis, a reasonable jury could conclude that Suarez attempted to direct his services to the benefit of a foreign terrorist organization.
>
> Suarez argues that there was no coordination or direct contact with an actual foreign terrorist organization because he had contact only with the government informant and undercovers.  But it is irrelevant that he did not make contact with ISIS, because the law requires only that Suarez directed (or attempted to direct) his services to ISIS…Suarez had the requisite intent to coordinate with ISIS and direct his services to ISIS, and he took substantial steps to do so.  Accordingly, there was sufficient evidence to

convict Suarez for attempting to provide material support to a foreign terrorist organization…."

*Id.*

Likewise, in *United States v. Hendricks*, 950 F.3d 348, 354 (6th Cir. 2020), the Sixth Circuit determined that there was sufficient circumstantial evidence to show that the defendant attempted and conspired to direct personnel or services to ISIS.  There, the defendant had approached a group of people and proposed waging jihad in the United States.  *Id.* at 350.  He had also expressed admiration for ISIS and asked the prospective group members to recruit other like-minded individuals.  *Id.*  The court stated that, among other things, the defendant had expressed allegiance to the leader of ISIS, asked members of the group to distribute ISIS propaganda, had described himself as a "limb" or an "outpost" and ISIS as the "ultimate brain" or "headquarters," and identified himself as a recruiter.  *Id.* at 353-54.  It held that the government was not required to present "direct evidence of any conversation or meeting with specific ISIS members where Hendricks was directed or proposed to establish an ISIS cell."  *Id.* at 354.  Instead, "there was a mountain of circumstantial evidence from which a juror could find beyond a reasonable doubt that Hendricks attempted and conspired to direct services or personnel to the ISIS organization—not merely operate an 'entirely independent[ ]' venture."  *Id.* (citing 18 U.S.C. § 2339B(h)).

Here, there is the same "mountain of circumstantial evidence" showing that the Defendant provided money, other services, and personnel in support of ISIS, a designated foreign terrorist organization.  Specifically, on several occasions, the Defendant sent money via PayPal to a woman in a camp in Syria. In return, the

woman put the Defendant in touch with a facilitator who could assist the Defendant with travel overseas to make *hijrah*. Additionally, the Defendant pledged his own allegiance to ISIS, and spread ISIS propaganda and radical ISIS jihadi ideology online and in person (to Ahmed). Moreover, for the eight months that the Defendant and Ahmed were in contact, the Defendant educated Ahmed in the ways of radical Islam, encouraged Ahmed to travel overseas for *hijrah*, and advised Ahmed on how to avoid detection by law enforcement. He discussed the best routes to take to travel to join ISIS and bought plane tickets on more than one occasion in preparation for his own travel. PSR, Doc. 65 ¶¶ 31, 36. Thus, the Defendant attempted not only to provide himself as personnel to ISIS, but also attempted, through his recruitment efforts, to also provide Ahmed as personnel to ISIS.

Moreover, the Defendant in this case clearly attempted to obstruct the FBI's specific terrorism investigation into the Defendant's support of a foreign terrorist organization by lying during an FBI interview about his contact with "Ahmed," his support of ISIS, and his plans to travel overseas to fight for ISIS. Thus, in accordance with Application Note 2, the Defendant's offense in this case should be deemed to involve or been intended to promote a federal crime of terrorism. *See Ashqar,* 582 F.3d at 824 (affirming an Application Note 2-based enhancement based on the refusal to testify).[8]

---

[8] Some Circuits, however, have required a showing of "actual obstruction," and determined that attempted obstruction is insufficient. *Benkahla*, 501 F. Supp. 2d at 757; *see also Graham*, 275 F.3d at 519 (applied to § 371 conspiracy); *United States v. Thurston*, No. CR 06-60069-01-AA et al., 2007 U.S. Dist. LEXIS 38185 (D. Or. May 21, 2007) (applied to § 371 conspiracy)

*B. The Defendant's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."*

In applying the terrorism enhancement, the Eleventh Circuit has explained that the focus of the terrorism enhancement is "the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was." *Jayyousi*, 657 F.3d at 1115 (upholding application of terrorism enhancement where record demonstrated that defendant's activities were intended to displace "infidel" governments that opposed radical Islamist goals); *United States v. Mandhai*, 375 F.3d at 1248 ("[I]t is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered."); *United States v. Bell*, 81 F. Supp. 3d 1301, 1311–12 (M.D. Fla. 2015) (applying terrorism enhancement where evidence at sentencing showed the defendant's goal was to play a role in the overthrow of secular governments and their replacement with government's rooted in radical Islam; and where the defendant traveled to fight for a foreign terrorist organization); *Awan*, 607 F.3d at 316–17 (finding that government only had to demonstrate that defendant's offenses were intended to promote a federal crime of terrorism, whatever his reasons for committing them).

---

(unreported); *United States v. Aref*, 2007 WL 804814 (N.D.N.Y. Mar. 14, 2007) (money laundering) (unreported); *United States v. Arnaout*, 431 F.3d 994, 1000–01 (7th Cir. 2005) (§3A1.4 analysis was appropriate to RICO conviction); *United States v. Hale*, 448 F.3d 971, 988 (5th Cir. 2005); *United States v. Biheiri*, 356 F. Supp. 2d 589, 600 (E.D. Va. 2005).

As the Eleventh Circuit has stated, "whether a defendant's offense is calculated (i.e., intended) to influence, affect, or retaliate against government conduct is a highly fact specific inquiry that requires examining the record as a whole….because a defendant often will not admit his full knowledge or intentions, the district court may find the requisite calculation or intent existed based on circumstantial evidence and reasonable inferences drawn from the facts." *United States v. Arcila Ramirez*, 16 F.4th 844, 854–55 (11th Cir. 2021) (finding error, even though the defendant's offense was enumerated under § 2332b(g)(5), where the district court made no factual findings on the issue of the requisite calculation nor defendant's specific intent).

Here, by swearing the *bay'ah*, the Defendant avowed submission to ISIS and obliged himself to effect the ends sought by ISIS (namely, the propagation of the Islamic State), no matter the means. Further, the Defendant's conduct (in, among other things, taking the pledge, attempting to provide himself as personnel to ISIS as a jihadi fighter, and attempting to recruit, radicalize, and provide Ahmed as personnel) illustrates that his goal was to play a role in the overthrow of "enemy" states that opposed the spread of the Islamic State and ISIS rule.  However, if there was any question as to the Defendant's specific intent or calculation to affect the conduct of government by intimidation or coercion, the Defendant's own statements quickly answered that question.  As the testimony at sentencing is expected to show, the Defendant made the following statements, among others, online to the UC:

➢ **November 30, 2019** – "I wasn't into the concept of Jihad until recently akhi.[9]  I was brainwashed into thinking the west is doing the justice by fighting the killers of Muslims…..It's the complete opposite….[W]e must liberate the entire Muslim world. They're all corrupt, or the majority, and remove the borders."

➢ **December 7, 2019** – The Defendant sent to the UC an image and breaking news of an active shooter terrorist attack on a United States Navy building in Florida with the comment: "May allah grant him Jannah." (that is, may God grant him heaven);

➢ **December 10, 2019** – The Defendant wrote online that the Chinese Embassy should be attacked, but then deleted that message and wrote: "Nvm china isn't our biggest problem.  The biggest problems are those killing Muslims.  France, USA, and Uk need to be brought to justice.  Someone needs to be brave enough to face these crusaders."

➢ **December 29, 2019** - "Akhi if I cannot make hijrah, the least I could do is to assassinate my state's governor.  He's a strong supporter of Israel and passed a law ruining the business life of anyone who's against Israel.  Idk what to do akhi.  I can't let my life go to waste paying the taxes to these infidels."

➢ **December 30, 2019** - "I've got to learn marksmanship to be useful for future purpose bi idhnillah. We have advantage living in America as we can go to a shooting range, unlike others. MashaAllah I just read the speech and it moved me.  InshaAllah we will fulfill the motives of our Amirul mumineed and make the khilafah of Al Baghdadi seem like the easier part, compared to the future.  Because the fighting has just begun."

➢ **January 17, 2020** - "If it was up to me, I would've done [*hijrah*] a long time ago when I had about $3k.  I hate every minute I'm here because my tax is being funded to kill and oppress our brothers and sisters."

Further, as the testimony at sentencing is expected to show, the Defendant also made the following statements, among others, to Ahmed in 2020:

---

[9] "Akhi" means brother in Arabic.

➢ **January 20, 2020** – Ahmed asked the Defendant what he thought about the U.S. bombing Iran and the Defendant said he does not care because it is enemies fighting enemies.

➢ **February 12, 2020** – The Defendant said he discovered the American military just wants to divide Muslims so they can take over.  The Defendant also said the US military killed 60 civilians in Afghanistan and another 30 civilians in Iran.  The US military kills civilians and the don't care.  The Defendant explained that the US requires something from Muslim countries, or they will fight them.  The Defendant advised anyone that will not obey America will have to fight like Sadam Hussein.

When asked by Ahmed what could be done, the Defendant said you cannot follow the American Government.  The Defendant stated that living in America and paying taxes is supporting and if you support then you are *Kufar*.

➢ **July 15, 2020** – The Defendant discussed Boko Haram (Nigeria based group looking to overthrow the government) has given *Bay'ah* to *Dawlah* and now has conducted attacks in Chad.

➢ **July 25, 2020** – The Defendant stated the facilitator told him they really wanted westerners there, and the westerners get used for videos as a weapon against the west in order to humiliate the west.  Defendant said the facilitator told him that westerners get the most respect because they have the hardest time to get there since they have to cross and ocean.

The Defendant asked Ahmed if he was going to rip his passport up when he landed.  The Defendant said once you ripped up your passport you were saying I am not longer an American citizen, I am a Dawlah citizen.  The Defendant resolved that is why he was going to burn his passport, birth certificate and ID.

➢ **August 12, 2020** – The Defendant stated that, a few weeks ago, Dawlah sent a video telling followers that if you cannot make hijra to start fires.  The Defendant mentioned the current fires in California and last time this happened it cost the government 1.5 billion dollars in damages.  The Defendant said since the Kufar lost so much money from the fires it is a good way to do it and barely anyone died but the property was destroyed.

> The Defendant said that, If the kufar kill your women, children, and men you can do it back to them.  The Defendant stated that you should focus on the police and military officers. MB stated the police are everywhere, a brother in New York stabbed three police during a protest.

These statements illustrate that the Defendant's conduct was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

In objecting to the application of the terrorism enhancement, the Defendant relies on *United States v. Alhaggagi*, a non-binding Ninth Circuit case vacating application of the terrorism enhancement, to argue that the Defendant here lacked the requisite specific intent. *See United States v. Alhaggagi*, 978 F. 3d 693 (9th Cir. 2020).  Defendant's reliance on *Alhaggagi* is misplaced, however, because the defendant's conduct in that case did not illustrate the same level of specific intent and/or calculation to influence government or affect the conduct of government by intimidation or coercion as the Defendant's conduct here. *See Arcila Ramirez*, 16 F.4th at 854–55 ("whether a defendant's offense is calculated (i.e., intended) to influence, affect, or retaliate against government conduct is a highly fact specific inquiry that requires examining the record as a whole).

The Defendant in *Alhaggagi* provided material support by opening six social media accounts on two occasions for people he understood to be ISIS sympathizers. 978 F.3d at 700-704.  The Ninth Circuit explained that, in its view, "opening a social media account does not inherently or unequivocally constitute conduct motivated to

24

"affect or influence" a "government by intimidation or coercion." *Id*. at 702. According to the Ninth Circuit, the district court's "cause and effect" reasoning was insufficient because the cause (opening social media accounts) and the effect (influencing government conduct by intimidation or coercion) are "much too attenuated to warrant the automatic triggering of the enhancement." *Id*. In the Ninth's Circuit's view, because the district court failed to determine whether Alhaggagi knew how the accounts he opened were to be used, it could not find that he specifically intended that the accounts be used to coerce or intimidate a government. *Id*. at 701.

In contrast, the Defendant in this case provided material support by, among other things, sending money overseas to support ISIS; recruiting Ahmed to travel with him overseas to become a jihadi fighter; and attempting to travel overseas himself to become a jihadi fighter. Moreover, the Defendant's own statements, referenced above, eliminate any question that the Defendant's goal (his specific intent) in providing this type of support to ISIS was, in fact, to influence government (that is, any government opposed to ISIS rule, including but not limited to, the United States) or affect the conduct of government (that is, getting governments to submit to ISIS rule and dominion) by intimidation or coercion (that is, killing anyone standing in the way of ISIS and its perpetuation of the Caliphate). Thus, unlike in *Alhaggagi*, the Defendant's conduct in attempting to offer himself and

Ahmed to fight and kill for ISIS, taken in the factual context discussed herein, was unequivocally calculated to affect or influence a government through intimidation or coercion.

## II.   The § 3553 Factors Support a Significant Term of Imprisonment

In sentencing a criminal defendant, the court must consider the advisory guidelines range and the factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Rosales-Bruno*, 789 F.3d 1249, 1253-54 (11th Cir. 2015). The Section 3553(a) analysis begins with the court's consideration of the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).  Moreover, the sentence imposed should (1) adequately reflect the seriousness of the offense, (2) promote respect for the law, (3) provide just punishment, (4) afford adequate deterrence, (5) protect the public from future crimes of the defendant, and (6) provide the defendant with any necessary training or treatment. 18 U.S.C. § 3553(a)(2). The court should also consider the kinds of sentences available, any pertinent policy statement, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *Id.* at (a)(3)-(6).

a.  *The Nature and Circumstances of the Offense*

The Defendant lied to FBI, in relation to FBI's international terrorism investigation, on two separate occasions when questioned about his support of ISIS and his plans to travel overseas. The backdrop to these lies, of course, was the Defendant providing, and attempting to provide, material support to a foreign

terrorist organization by, among other things: promoting, online and in person (to Ahmed), extremist ISIS propaganda, including beheading and rape videos, preparing his own travel overseas to Syria or Iraq to fight for ISIS, and encouraging Ahmed to, likewise, commit himself to ISIS. In fact, as the Defendant sat untruthfully answering FBI's interview questions, he believed Ahmed, who the Defendant himself radicalized and attempted to recruit for ISIS, to already be in Iraq or Syria waging jihadi war.

During the years leading up to the Defendant's lies to FBI, he spoke extensively about jihad, both by fighting for ISIS overseas, and by committing attacks in America. Because he had sworn his *bay'ah*, he was <u>obligated</u> to act in accordance with ISIS tenets. In this regard, the Defendant had pledged his allegiance to ISIS leadership, and was required to act upon ISIS mandates. As the Defendant stated: "InshaAllah we will fulfill the motives of our Amirul mumineed and make the khilafah of Al Baghdadi seem like the easier part, compared to the future. Because the fighting has just begun."[10]

The Defendant's conduct, however, went far beyond talking. On several occasions, the Defendant sent money overseas to support the ISIS cause. As the testimony at sentencing is expected to show, he actually made contact with an ISIS facilitator to assist him with joining ISIS overseas. He referred that facilitator to

---

[10] Meaning that, "Godwilling (inshaAllah) we will fulfill the motives of our ISIS leader (Amir al-Mu'minin is the Arabic title designating the supreme leader of an Islamic community) and make the Caliphate (khilafah means caliphate (or Islamic State) of Al Baghdadi seem like the easier part, compared to the future. Because the fighting has just begun."

Ahmed, and that facilitator actually spoke to Ahmed on the phone to discuss their intentions for *hijrah* and support for ISIS.  PSR, Doc. 65, ¶¶ 29-30.  The Defendant, on more than one occasion, went so far as to buy plane tickets to Turkey, a substantial step towards traveling to join ISIS overseas. Thus, this was not a case where the conduct was limited to idle talk.  Here, the Defendant took action to provide to ISIS the monetary resources he could until he was either on the frontlines overseas as a jihadi fighter or he was committing violent attacks on U.S. soil in the name of ISIS.

For these reasons, the offense requires a significant sentence of imprisonment that reflects the seriousness of the Defendant's conduct.

b. *The History and Characteristics of the Defendant*

The Defendant is a fully radicalized, sworn follower of ISIS.  His dedication to ISIS began sometime around 2019 and escalated through the date of his arrest in 2022.  Thus, the Defendant's radical jihadi ideology was not simply some immature phase.  As the testimony at sentencing is expected to show, in the years leading up to his arrest, the Defendant educated himself on geo-political tensions involving ISIS, learned Arabic, and became more knowledgeable about what could potentially lead to law enforcement detection of his support of ISIS.  Indeed, he was savvy in his deliberate deception. As referenced herein, the Defendant would often warn Ahmed about pitfalls that could lead to their arrest.  The Defendant instructed Ahmed to only use initials when referencing radical Islamic principles; he warned Ahmed to get a new phone, not just wipe his old one; he meticulously planned his travel overseas,

28

and he spent hours on end discussing logistics and the best option for actually reaching ISIS in Iraq or Syria.  Thus, the Defendant's conduct was calculated, premeditated, and intended to evade detection by law enforcement.

Despite the Defendant's portrayal to the contrary in his sentencing memorandum, the facts of this case establish that the Defendant was not just a kid who had some misguided fantasy about becoming an ISIS fighter. Instead, the Defendant took escalating steps over a period of years to satiate his growing appetite for ISIS: showing interest in radical ideology; spreading propaganda; swearing the *bay'ah*; talking about *hijrah*; sending money overseas to support ISIS; making plans to make *hijrah*; buying tickets to travel; and, finally, lying to the FBI about his support of ISIS.  Further, based on anticipated testimony at sentencing, the Defendant was given repeated opportunities by Ahmed to change his mind and disavow his plan to support ISIS. But, each time, the Defendant chose to move ahead.  Even months after Ahmed had notionally travelled overseas and had not been in communication with the Defendant for several months, the Defendant moved forward with booking a plane flight to Turkey on his own.

Further, while the Defendant is a young, intelligent man, with no prior criminal convictions, those factors do not mitigate the Defendant's dangerousness in this case. By his own admission, the Defendant wanted to kill as many people as possible for ISIS.  He spoke of committing attacks on U.S. soil and abroad and praised others who had committed terrorist attacks. Additionally, the Defendant was smart.  In fact, he was savvy enough to not only find ISIS online, but to quickly

make an actual connection with an ISIS facilitator.  As the testimony at sentencing is expected to show, the Defendant taught himself Arabic, "for the sake of *hijrah*." Also based on anticipated testimony at sentencing, he was also using his schooling for the benefit of ISIS, stating that, when you have a degree, you have a reason to make *hijrah*. As the Defendant explained at one point to Ahmed, he was thinking about changing his major to Architecture because it was good to have a major that helps you get work in another country so you can make *hijrah*.  In the Defendant's view, even if you cannot make *hijrah*, you can get a job in another country and wait.

The Defendant's lies to the FBI also illustrated his deliberate deception and premeditation.  In conversations with Ahmed, the Defendant had explained that, in the event he was questioned about his planned travel to Turkey, he would simply respond that he was going to visit the Hagia Sophia mosque (as a cover for his true intentions of traveling to Turkey as a means to get to Iraq or Syria to reach ISIS). Then, when questioned by FBI about purchasing a ticket overseas to Turkey, the Defendant did exactly what he told Ahmed he was going to do – he lied and said he was planning a tourist trip to see the Hagia Sophia mosque.  Likewise, in conversations with Ahmed, as the testimony at sentencing is expected to establish, the Defendant explained that he would attempt to conceal the true nature of his payments of money overseas by saying that the money was for humanitarian aid. Sure enough, when asked by FBI about money he sent overseas, the Defendant

claimed it was for purposes of humanitarian aid (feeding the poor).  Thus, the Defendant had carefully pre-crafted answers to try to avoid culpability for his conduct.

Finally, the Defendant's hearing impairment does not lessen his culpability in this case, nor does it lessen his capability of doing devastating harm in the future. The United States does not dispute that the Defendant has some level of hearing impairment and corresponding speech impediment, and sometimes wears hearing aids.  That fact, however, has virtually no bearing on the Defendant's culpability in this case.  The Defendant had no problem spreading ISIS propaganda online; no problem discussing violent jihadi ideology with Ahmed in person; no problem attending college; no problem teaching himself Arabic; and no problem finding and communicating with an ISIS facilitator for the purpose of *hijrah*. Nor did the Defendant appear to struggle at all to understand the FBI during interviews, or to answer FBI's questions. In fact, on one occasion while talking to Ahmed, the Defendant explained, in the context of discussing the prospect of taking his hearing aids when he traveled overseas, that if someone was far away, the Defendant could not hear them, but if they were close, then the Defendant had no problem hearing. According to the Defendant, he hadn't worn his hearing aids in about 6 years but would take them when he traveled. Thus, the defendant's hearing loss and/or speech impediment posed no problem to the Defendant in committing the offense conduct and would not hinder him in the future in providing continued support to ISIS.

c.  *The Need to Protect the Public, Reflect the Seriousness of the Crime, Deter the Defendant and Others, and Provide Just Punishment*

A significant term of imprisonment is required here to promote the purposes of sentencing under 18 U.S.C. § 3553. First, the Defendant poses a real and serious threat to the public. The Defendant has demonstrated his desire, willingness, and ability to provide material support to a foreign terrorist organization. Specifically, he is willing to make the single most significant sacrifice possible for ISIS – he is willing to sacrifice his own life. He obsessively talked to Ahmed about killing, watched ISIS executions on repeat, and discussed obtaining a gun to kill police officers at the border in Jordan. Perhaps, most concerning, the Defendant knows how and where to find ISIS and has actually made direct contact with an ISIS facilitator overseas. Thus, the Defendant has all the ingredients to actually carry out a violent act on U.S. soil and/or abroad.  In this regard, as the testimony at trial is expected to show, the Defendant's own statements to Ahmed in July 2020 are telling, as the Defendant explained that his family thought he was doing little, but soon they would see how far along he had grown and likened it to an explosion.

A significant term of imprisonment is also needed to reflect the seriousness of the offense; deter future criminal conduct by the Defendant and others; and to provide just punishment. As discussed above, the totality of the Defendant's offense conduct, which was intended to promote a federal crime of terrorism, is not only serious, but frightening.  Additionally, the sentence imposed must deter the Defendant, specifically, and must also generally deter other individuals from

following down the same extremist path that led to the Defendant's arrest. There is no question that ISIS infiltrates online communication platforms exposing young people to its radical ideology. Moreover, from the Defendant's own statements in this case, it is obvious that individuals, like the Defendant, who are contemplating supporting ISIS are concerned with getting caught and going to jail. It is highly likely, that other individuals, like the Defendant, stay informed as to the prosecutions of those who have gone before them to provide material support to ISIS.

Finally, a significant term of imprisonment is needed to justly punish the Defendant. Here, a just punishment, in light of the offense conduct and the Defendant's history and characteristics, is a term of 96 months' imprisonment on each of Counts One and Two, to run concurrently, and a 3-year term of supervised release to follow.  With the terrorism enhancement, the Defendant's guidelines are 151 to 188 months. Thus, a total term of imprisonment of 96 months is significant, but also reflects the Defendant's young age and lack of prior criminal history.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that the Court overrule the Defendant's objection to application of the terrorism enhancement; and sentence the Defendant to a term of imprisonment of 96 months on Count One and a term of imprisonment of 96 months on Count Two, to run concurrently.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   */s/ Kara M. Wick*
Kara M. Wick
Assistant United States Attorney
FL Bar No. 0085578
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
E-mail:       kara.wick@usdoj.gov

**U.S. v. BENKABBOU**                                    **Case No. 6:23-cr-3-RBD-DCI**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Corey I. Cohen, Esq.

*/s/ Kara M. Wick*
Kara M. Wick
Assistant United States Attorney
FL Bar No. 0085578
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail:        Kara.Wick@usdoj.gov

35